# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 20-3216

———————————————

Carpenters' Pension Fund of Illinois; Iron Workers Pension Fund, Local 11; Peoria Police Pension Fund; Laura Wood; Harkishan Parekh, derivatively on behalf of Centene Corporation

*Plaintiffs - Appellants*

v.

Michael Neidorff; Jeffrey A. Schwaneke; Robert K. Ditmore; David Steward; John R. Roberts; Tommy G. Thompson; Frederick H. Eppinger; Richard Gephardt; Orlando Ayala; Vicki B. Escarra; K. Rone Baldwin; Carol E. Goldman; Centene Corporation, a Delaware corporation

*Defendants - Appellees*

———————————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

———————————

Submitted: September 23, 2021
Filed: April 7, 2022

———————————

Before SHEPHERD, WOLLMAN, and KOBES, Circuit Judges.

———————————

SHEPHERD, Circuit Judge.

Following the merger of Centene Corporation (Centene) and Health Net, Inc. (Health Net), certain shareholders of Centene (collectively, Appellants) brought five

claims on behalf of the corporation against certain of its former and then-current directors and officers and nominal defendant Centene (collectively, Appellees): (1) violation of § 14(a) of the Securities Exchange Act of 1934; (2) breach of fiduciary duties of good faith, fair dealing, loyalty, and due care; (3) breach of fiduciary duty of loyalty, good faith, and candor in connection with securities law violations; (4) insider trading; and (5) unjust enrichment. Appellants did not make pre-suit demand on Centene's Board of Directors (the Board) and the district court[1] dismissed their complaint with prejudice, finding that Appellants had failed to plead particularized facts demonstrating that demand would have been futile. Appellants appeal the district court's dismissal, and having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Centene is a Delaware corporation that sells health insurance policies for Medicaid, Medicare Advantage, and Medi-Cal, among other products. Prior to its merger with Centene, Health Net sold health insurance policies to individuals, families, and businesses; offered behavioral health, substance abuse, and employee assistance programs; and offered plans for the provision of prescription drugs. In November 2014, Centene's President and CEO, Michael F. Neidorff, contacted Health Net's CEO, Jay Gellert, to discuss their respective businesses. On June 8, 2015, Neidorff informed Gellert that Centene was interested in pursuing a potential business combination with Health Net. Throughout the remainder of June 2015, the Board met on several occasions to discuss the proposed transaction. On July 1, 2015, the Board unanimously approved a merger of the two companies, and the next day, Centene and Health Net put out a joint press release announcing the merger.

Centene and Health Net issued a joint proxy statement (the Proxy Statement) on September 21, 2015, asking for shareholder approval of the merger. The Proxy

---

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

-2-

Statement detailed the considerations made and rationale in pursuing the transaction, negotiations between the companies, and risk factors associated with the transaction. On October 23, 2015, Centene's shareholders voted to approve the merger, which ultimately closed on March 24, 2016, after regulatory approval. Appellants allege that at the time the Proxy Statement issued, and continuing through the closing date, Centene's directors and officers concealed their knowledge of Health Net's significant financial problems from shareholders, including that Health Net had poorly designed and unprofitable policies, was subject to liability based upon its refusal to pay claims from substance abuse treatment centers in California, and had significant potential tax liabilities.

On April 26, 2016, Centene filed a SEC Form 10-Q (the April 10-Q) reporting its first-quarter financial performance. There, Centene stated that due to the timing of the merger's closing, only preliminary estimates of Health Net's assets and liabilities as of the date of acquisition were available for reporting and such estimates were subject to change. The April 10-Q did not address any premium deficiency reserves (PDRs)[2] that may have been necessary to cover Health Net liabilities, even though Centene's audit committee had determined on April 25, 2016, the day before the form was filed, that the PDRs for Health Net needed to be set, at a minimum, to $117 million. Following the filing of the April 10-Q, Neidorff and other Centene officers assured the public of the merger's success on multiple occasions.

On July 26, 2016, Centene released its second-quarter financial results. These results disclosed a $390 million increase in reserves for Health Net's increased liabilities, including a $90 million increase in reserves for disputed claims arising from Health Net's dealings with substance abuse treatment centers and a $300 million PDR booked to account for potential losses related to underperforming contracts. Following this disclosure, Centene's stock price dropped more than 8%, amounting to a loss of over $1 billion in stockholder value. Neidorff later admitted

_____

[2]"A premium deficiency reserve is an accounting tool that acknowledges that a firm's projected losses are greater than its projected premiums." United States v. Aetna Inc., 240 F. Supp. 3d 1, 87 (D.D.C. 2017).

-3-

that Centene knew of problems with Health Net's business and policies prior to the merger. Further, between the time the merger was approved by shareholders and the release of Centene's second-quarter financial results, several Centene directors and officers sold or disposed of nearly half-a-million shares of Centene stock worth more than $28 million in total.

After the district court consolidated Appellants' separate derivative actions, Appellants filed their Verified Consolidated Amended Stockholder Derivative Complaint (the Amended Complaint). Significantly, Appellants did not demand that the Board bring the desired lawsuit, instead arguing that demand would be futile because a majority of the Board could not have impartially considered whether to bring such suit. At the time Appellants filed the Amended Complaint, the Board consisted of nine directors: inside-director Neidorff and eight outside directors. Appellees include Neidorff and outside-directors Robert K. Ditmore, David L. Steward, John R. Roberts, Tommy G. Thompson, Frederick H. Eppinger, Richard A. Gephardt, and Orlando Ayala (collectively, the Director Defendants). Outside-director Jessica Blume, who was not a director when the Proxy Statement issued in September 2015, is not named as a defendant.

Appellees filed a motion to dismiss the Amended Complaint, arguing that Appellants failed to plead demand futility. The district court granted Appellees' motion and dismissed the case with prejudice, finding that Appellants failed to plead facts with sufficient particularity that would excuse pre-suit demand. Appellants timely brought the present appeal, arguing that the district court erred in finding that the Amended Complaint failed to demonstrate demand futility.

## II.

We review a district court's grant of a motion to dismiss de novo, accepting all allegations within the complaint as true. Gomes v. Am. Century Cos., 710 F.3d 811, 815 (8th Cir. 2013). "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" Id. (quoting

-4-

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Federal Rule of Civil Procedure 23.1, however, subjects complaints in a derivative action to a heightened pleading standard, requiring that shareholders "state with particularity . . . any effort . . . to obtain the desired action from the directors or comparable authority" and "the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  This Court recognizes Rule 23.1 as "'a rule of pleading' that 'requires that the complaint in such a case allege the facts that will enable a federal court to decide whether such a demand requirement has been satisfied.'"  Gomes, 710 F.3d at 815 (citation omitted).  Thus, where shareholders do not make demand on the board, those shareholders must plead with particularity the reasons why such demand would have been futile and should therefore be excused.

Before reaching the merits of the issue, we must first determine the proper framework for assessing demand futility.  Because Centene is a Delaware corporation, Delaware law applies.  See Cottrell ex rel. Wal-Mart Stores v. Duke, 829 F.3d 983, 989 (8th Cir. 2016).  For many years, Delaware courts applied one of two tests for demand futility, with the appropriate test dictated by the composition of the board upon which demand was to be made (the demand board).  The first test, set forth in Aronson v. Lewis, applied where the complaint challenged a decision made by the demand board and required plaintiffs to plead particularized facts demonstrating a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  Rales v. Blasband, 634 A.2d 927, 933 (Del. 1993) (alteration in original) (quoting Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000)).  Alternatively, the second test, set forth in Rales v. Blasband, applied "where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit."  634 A.2d at 933-34.  The Rales test required the court to "determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its

independent and disinterested business judgment in responding to a demand." Id. at 934.

After the district court entered its order dismissing the Amended Complaint, the Delaware Supreme Court eliminated this distinction and announced a new, "universal" test that encompasses both the Aronson and Rales tests. See United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg (Tri-State), 262 A.3d 1034, 1058-59 (Del. 2021). This new test consists of three questions to be analyzed on a director-by-director basis[3] when making a demand futility determination:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

---

[3]Here, as in Cottrell, where we declined "to fault the shareholders for not 'plead[ing] facts director-by-director'" because "the shareholders' theory of the case was that the relevant directors all learned about the investigators' suspicions of bribery in the same way and faced liability for the same reasons," Appellants allege that a majority of the Board learned about the problems with Health Net in the same way. See 829 F.3d at 992 n.10 (alteration in original). Therefore, to the extent that the Amended Complaint does not plead all facts "director-by-director" but, instead, pleads some facts against the Director Defendants as a group, "we see nothing that would have been gained by demanding that they repeat the same allegations 'director-by-director' in their complaint" and do not fault Appellants for their failure to do so. Id.

Id. at 1059. Demand is excused as futile if the answer to any of the above questions is "yes" for at least half of the members of the demand board. Id. Importantly, this test "does not change the result of [the] demand-futility analysis" and "is consistent with and enhances Aronson, Rales, and their progeny," which "remain good law." Id. at 1058-59. Thus, because this new test is merely a synthetization of Delaware precedent that was available to Appellants at the time the Amended Complaint was filed, we find that granting Appellants' request that we remand to allow Appellants the opportunity to replead would not afford Appellants any opportunity that was not already within their reach.

With the proper framework established, we now turn to the question of whether Appellants have pled demand futility as to each of their five claims.[4] No detailed analysis is needed as to the first Tri-State question because the Amended Complaint makes no allegation that at least half of the Board received a material personal benefit from the conduct alleged. Similarly, we need not delve into the

___

[4]As to their first three claims, Appellants failed to structure the argument section of their opening brief in a claim-by-claim manner, instead focusing entirely on what information the Board knew at various points. At oral argument, Appellants indicated that this Court's opinion in Cottrell served as the blueprint for their Amended Complaint. From what we can discern, Appellants implemented the same strategy in drafting their opening brief. Cottrell, however, does not override Delaware law's instruction that "[d]emand futility analysis is conducted on a claim-by-claim basis." Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart (Beam I), 833 A.2d 961, 977 n.48 (Del. Ch. 2003). In Cottrell, it was unnecessary for this Court to address the details of the shareholders' individual claims because a common threshold requirement—namely, knowledge of the alleged misconduct—underlying each claim was not met. 829 F.3d at 990 & n.8. Appellants seem to take from Cottrell that if they can demonstrate that the Board knew of the problems with Health Net, then they have adequately pled demand futility. See Appellants' Br. 45-47. This is not so. Had the shareholders in Cottrell met the threshold requirement, an analysis of their individual claims would still have been required to determine whether at least half of the directors faced a substantial likelihood of liability as to each alleged claim. See 829 F.3d at 990 n.8.

third question because Appellants have failed to argue it on appeal.[5]  See Falco v. Farmers Ins. Grp., 795 F.3d 864, 868 (8th Cir. 2015) ("Questions not raised, briefed

_____

[5]Even had Appellants made this argument, they have not pled facts demonstrating that at least half of the Board lacks independence from a director who either received a material personal benefit from the alleged misconduct or faces a substantial likelihood of liability on any of the claims alleged in the Amended Complaint.

> To show a lack of independence, a derivative complaint must plead with particularity facts creating "a reasonable doubt that a director is . . . so 'beholden' to an interested director . . . that his or her 'discretion would be sterilized.'"
>
>     . . . The plaintiff must allege that "the director in question had ties to the person whose proposal or actions he or she is evaluating that are sufficiently substantial that he or she could not objectively discharge his or her fiduciary duties."

Tri-State, 262 A.3d at 1060-61 (first and second alteration in original) (first quoting Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart (Beam II), 845 A.2d 1040, 1050 (Del. 2004); then quoting Kahn v. M & F Worldwide Corp., 88 A.3d 635, 649 (Del. 2014) (overruled on other grounds by Flood v. Synutra Int'l, Inc., 195 A.3d 754 (Del. 2018))).

Appellants allege that the Board members lack independence from one another because a majority have been on the Board for "at least 12 consecutive years"; they have instituted "self-serving measures that foster their entrenchment," such as "imposing a staggered board"; and each Board committee has had the same chairperson for at least 12 years. R. Doc. 45-1, at 77-78. Appellants further make the bare assertion that the Board members are "personal friends" with "entangling financial alliances, personal and business interests and other dependencies." R. Doc. 45-1, at 84. Without more, these allegations do not demonstrate a lack of independence. See Beam II, 845 A.2d at 1050-52 ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."); In re MFW S'Holders Litig., 67 A.3d 496, 509-10 (Del. Ch. 2013) ("[T]he simple fact that there are some financial ties between the interested party and the director is not disqualifying."); In re BJ's Wholesale Club, Inc. S'holders Litig., No. 6623–VCN, 2013 WL 396202, at

-8-

or argued will ordinarily be given no consideration by an appellate court." (citation omitted)).

This leaves the second Tri-State question, which is the same question addressed by the district court and briefed by the parties: whether at least half of the Board (i.e., five of the nine directors) faces a substantial likelihood of liability as to any of Appellants' five claims. See 262 A.3d at 1059. As a preliminary matter, though Appellants allege on appeal that all nine directors face a substantial likelihood of liability because they knew of material problems with Health Net's business and concealed them from stockholders, the Amended Complaint does not name Blume as a defendant or explain how she could have participated in such conduct prior to joining the Board. Because Blume does not face a substantial likelihood of liability as to any of Appellants' five claims, our focus is on the remaining eight directors (the Director Defendants).

A.

Appellants' first claim alleges that the Director Defendants violated § 14(a) of the Securities Exchange Act of 1934 by "negligently" issuing "false and misleading statements" within the Proxy Statement and failing to disclose additional information concerning Health Net's problems. R. Doc. 45-1, at 87. "Section 14(a) . . . provides that it is unlawful to solicit a proxy respecting any registered security in contravention of SEC rules and regulations. SEC Rule 14a-9(a) provides that no proxy statement may contain any false or misleading statement or omission with respect to a material fact." SEC v. Shanahan, 646 F.3d 536, 546 (8th Cir. 2011). "Section 14(a) 'was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is

---

*6 n.63 (Del. Ch. Jan. 31, 2013) (finding allegation that board members had served on board together nearly twenty years insufficient to raise reasonable doubt as to director's independence).

sought.'" SEC v. Das, 723 F.3d 943, 953 (8th Cir. 2013) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 444 (1976)).

A plaintiff who alleges a claim under § 14(a) must show that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 228 (3d Cir. 2007) (citation omitted); see also Kuebler v. Vectren Corp., 13 F.4th 631, 637 (7th Cir. 2021) (same); N.Y.C. Emps.' Ret. Sys., 593 F.3d 1018, 1022 (9th Cir. 2010) (same), overruled on other grounds by Lacey v. Maricopa Cnty., 693 F.3d 896 (9th Cir. 2012). Further, because "[t]he Private Securities Litigation Reform Act ('PSLRA') imposes heightened pleading standards in securities-fraud cases," Campbell v. Transgenomic, Inc., 916 F.3d 1121, 1124 (8th Cir. 2019) (citation omitted), the Amended Complaint must also "1) specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading, and 2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," Little Gem Life Scis. v. Orphan Med., 537 F.3d 913, 916-17 (8th Cir. 2008) (alteration in original) (citation omitted); see also 15 U.S.C. § 78u-4(b) (stating requirements for securities fraud actions). This Court has held that "scienter is an element" of § 14(a) claims brought "against outside directors," which seven of the eight Director Defendants were at the time the Amended Complaint was filed. Shanahan, 646 F.3d at 546.

"The question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." TSC Indus., 426 U.S. at 445. An alleged misrepresentation must have been, "at the time and in the light of the circumstances under which it is made . . . false or misleading with respect to any material fact." 17 C.F.R. § 240.14a-9(a). "A fact is material 'when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" Smelko v. Stratasys Ltd. (In re Stratasys Ltd. S'holder Sec. Litig.),

-10-

864 F.3d 879, 882 (8th Cir. 2017) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38 (2011)).  "The court views factual allegations most favorably to the plaintiff and assumes the truth of particularly pled allegations, but not of 'catch-all' or 'blanket' assertions that do not meet the particularity requirements of the statute." Campbell, 916 F.3d at 1124 (citation omitted).

Here, Appellants allege that the Proxy Statement "failed to disclose (i) the existing problems regarding claims from Health Net's substance abuse facilities; (ii) poorly designed and unprofitable policies in California and Arizona; (iii) potentially massive tax liabilities in California; and (iv) Health Net's purported involvement in a scheme to defraud Medicare."  R. Doc. 45-1, at 32.  Appellants argue in their reply brief that these alleged omissions rendered both the pro forma analyses included in the Proxy Statement and the Proxy Statement as a whole "incomplete and misleading."  Appellants' Reply Br. 16.  "As a general rule, we will not consider arguments raised for the first time in a reply brief.  We are not precluded from doing so, however, particularly where, as here, the argument raised in the reply brief supplements an argument raised in a party's initial brief."  Barham v. Reliance Standard Life Ins. Co., 441 F.3d 581, 584 (8th Cir. 2006) (citation omitted).  Here, we consider Appellants' argument in their reply brief to be further development of an argument raised in their opening brief, and therefore, it is appropriate for our consideration.  See Appellants' Br. 35.

Appellants' argument that the alleged omissions rendered the entire Proxy Statement misleading is a "blanket" assertion that lacks the specificity required by the PSLRA.  See Campbell, 916 F.3d at 1124.  As to Appellants' argument that the alleged omissions rendered the pro forma analyses misleading, we find that the cautionary language included in the Proxy Statement "renders the alleged . . . omissions immaterial as a matter of law."  Chambers v. AMDOCS Ltd. (In re AMDOCS Ltd. Sec. Litig.), 390 F.3d 542, 548 (8th Cir. 2004) (per curiam). "[C]autionary language must 'relate directly to that by which plaintiffs claim to have been misled.'"  Parnes v. Gateway 2000, Inc., 122 F.3d 539, 548 (8th Cir. 1997) (citation omitted).  Here, the Proxy Statement contains language in bold type

warning shareholders of "the uncertainties inherent in the unaudited financial projections" and cautioning them "not to place undue, if any, reliance on such unaudited financial projections." R. Doc. 79-3, at 118 (emphasis omitted).[6] We find that this language relates directly to the pro forma analyses by which Appellants claim to have been misled and, therefore, renders the alleged omissions immaterial.

Appellants additionally allege that the Proxy Statement "falsely or misleadingly states that: '[t]he combination of Health Net and Centene would maintain and enhance Health Net's strong commercial business in California, which could also serve as a model for other states in which similar opportunities can be identified.'" Appellants' Br. 35 (alteration in original). Our review of the Amended Complaint, however, reveals that though Appellants note this statement in the

---

[6]Among other cautionary language, the Proxy Statement also provides:

There can be no assurance that the underlying assumptions or projected results will be realized, and actual results will likely differ, and may differ materially, from those reflected in the unaudited financial projections, whether or not the merger is completed. As a result, the unaudited financial projections cannot necessarily be considered predictive of actual future operating results, and this information should not be relied on as such.

. . . In the view of Centene's management and Health Net's management, the respective forecasts prepared by them were prepared on a reasonable basis based on the information available to Centene's management and Health Net's management, respectively, at the time of their preparation. The unaudited financial projections, however, are not facts and should not be relied upon as being necessarily indicative of actual future results, and readers of this joint proxy statement/prospectus are cautioned not to place undue, or any, reliance on this information. The inclusion of the unaudited financial projections in this joint proxy statement/prospectus is not an admission or representation by Centene or Health Net that such information is material.

R. Doc. 79-3, at 117.

Amended Complaint, they at no point explicitly allege that this statement was misleading, and therefore, Appellants fail to meet the heightened pleading requirements under the PSLRA, which require that the Amended Complaint "specify each statement alleged to have been misleading." 15 U.S.C. § 78u-4(b)(1); see R. Doc. 45-1, at 24, 31.

As to Appellants' argument that the failure to update the Proxy Statement rendered it materially misleading, Appellants have not cited, and we have not found, any authority supporting the proposition that § 14(a) requires a company to update its proxy statement.[7] Moreover, this argument is inconsistent with the text of Rule 14a-9(a), which provides that a proxy statement may not contain "any statement which, *at the time* and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact," 17 C.F.R. § 240.14a-9(a) (emphasis added), and the language of the Proxy Statement itself, which provides in all capital letters that neither Centene nor Health Net intends to update the Proxy Statement and that both companies disclaim any responsibility to do so, R. Doc. 79-3, at 118.

For the reasons set forth above, Appellants have failed to plead facts showing that the Proxy Statement contained a material misrepresentation or omission and, consequently, have failed to plead particularized facts demonstrating that at least half of the Board faces a substantial likelihood of liability on their § 14(a) claim. Tri-State, 262 A.3d at 1059. We therefore affirm the district court's finding that the Amended Complaint does not allege facts showing the Director Defendants faced a substantial likelihood of liability on the claim that the Proxy Statement was misleading. Though the district court primarily focused on the outside directors' state of mind, because Appellants' failure to show that the Proxy Statement contained a material misrepresentation or omission is dispositive, we need not

---

[7]The one case Appellants cite in support of their argument, ZVI Trading Corp. Emps. Money Purchase Pension Plan & Tr. v. Ross (In re Time Warner Inc. Sec. Litig.), is not a case about proxy statements. 9 F.3d 259 (2d Cir. 1993).

address whether the Amended Complaint states with particularity facts giving rise to a strong inference that the outside directors acted with scienter.[8] See INS v. Bagamasbad, 429 U.S. 24, 25 (1976) ("As a general rule courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach."); Carlsen v. GameStop, Inc., 833 F.3d 903, 910 (8th Cir. 2016) ("[W]e may affirm a judgment on any ground supported by the record[.]" (alteration in original) (citation omitted)).

B.

Appellants' second claim alleges that all Appellees, including the Director Defendants, breached their fiduciary duties of good faith, fair dealing, loyalty, and due care when they allowed Centene to enter the merger based upon "inadequate due diligence and flawed process," overpay for Health Net, disseminate a "materially false and misleading" Proxy Statement, and "issue materially false and misleading

---

[8]Because the information included in the Registration Statements attached to Appellants' Motion to Supplement the Record and/or for Judicial Notice would not change our resolution of this issue, we deny the motion as moot. Robinson v. Pulaski Tech. Coll., 698 F. App'x 859, 859 (8th Cir. 2017) (per curiam); see also Dakota Indus., Inc. v. Dakota Sportswear, Inc., 988 F.2d 61, 63 (8th Cir. 1993) ("Th[e] authority to enlarge a record is rarely exercised and is a narrow exception to the general rule that an appellate court may consider only the record made before the district court."). Further, we find Appellants' efforts to introduce this evidence at this stage of the litigation vexatious. Appellants seek to supplement the record to include the Registration Statements containing the Proxy Statement to support their allegation that the Director Defendants signed the Proxy Statement, which itself is already part of the record. R. Doc. 79-3. Appellees disputed Appellants' argument that the seven outside directors signed the Proxy Statement in their motion to dismiss the Amended Complaint below, putting Appellants on notice that the contents of the Proxy Statement were in dispute. See R. Doc. 78, at 18 n.9. Appellants now seek to introduce the Registration Statements, which are not referenced in the Amended Complaint, to bolster their argument on appeal. "[W]e find no compelling reason to allow [Appellants] to supplement the record with evidence available from the [SEC] long before the district court decided this case." Bell v. Pfizer, Inc., 716 F.3d 1087, 1092 (8th Cir. 2013).

information concerning its business and Health Net's finances."[9]  R. Doc. 45-1, at 88.  The directors of a Delaware corporation owe two overarching fiduciary duties to the corporation and its shareholders: the duties of care and loyalty.  Dohmen v. Goodman, 234 A.3d 1161, 1168 (Del. 2020).  The Delaware Supreme Court has stated that "[w]henever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty."  Malone v. Brinecat, 722 A.2d 5, 10 (Del. 1998).

As to the duty of care, under Delaware law, a corporation may include a provision in its charter protecting directors from personal liability for breach of the duty of care.  Del. Code Ann. tit. 8, § 102(b)(7).  In Tri-State, along with articulating the proper test for demand futility, the Delaware Supreme Court clarified whether directors can face a substantial likelihood of liability based upon an exculpated duty of care violation.  After engaging in a thorough review of Delaware precedent published since the enactment of § 102(b)(7), the Tri-State court determined that exculpated duty of care claims cannot support a finding of a substantial likelihood of liability.  262 A.3d at 1052-54.  Therefore, because Centene's articles of incorporation contain an exculpation provision limiting directors' liability to the extent permitted by Delaware law, R. Doc. 79-12, none of the Director Defendants faces a substantial likelihood of liability on Appellants' duty of care claim.

---

[9]Appellees argue that Appellants have waived their fiduciary duty arguments by not arguing them on appeal.  Appellees' Br. 34.  Because Appellants do mention these arguments on appeal, however, we are not convinced that these arguments have been waived.  Regardless, whether or not these arguments have been waived is immaterial because Appellants have failed to plead this claim with particularity sufficient to demonstrate that at least half of the Board faces a substantial likelihood of liability.

-15-

This leaves the duty of loyalty.[10]  To show a substantial likelihood of liability on a breach of duty of loyalty claim,

> the plaintiff must plead with particularity that the directors "acted with scienter, meaning 'they had actual or constructive knowledge that their conduct was legally improper.'"  In other words, directors are liable for "subjective bad faith" when their conduct is motivated "by an actual intent to do harm," or when there is an "intentional dereliction of duty, a conscious disregard for one's responsibilities."  Pleading bad faith is a difficult task and requires "that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting."

McElrath v. Kalanick, 224 A.3d 982, 991-92 (Del. 2020) (citations omitted).  Thus, in order to show that the Director Defendants face a substantial likelihood of liability based upon breach of the duty of loyalty, Appellants must have pled particularized facts showing that each director allowed Centene to disseminate materially false and misleading information in bad faith, meaning with actual intent to do harm or with conscious disregard of his or her responsibilities.

We have reviewed the Amended Complaint in its entirety and agree with the district court that Appellants

> allege only that the directors knew or should have known of Health Net's actual status, the risks of continuing with the merger, and

---

[10]The Amended Complaint alleges, and Appellants argue on appeal, that the Director Defendants breached their duties of loyalty *and* good faith.  However, "good faith . . . is 'a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty.'"  In re Rural/Metro Corp. S'Holders Litig., 102 A.3d 205, 253 (Del. Ch. 2014) (quoting Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 370 (Del. 2006)).  Therefore, we need not separately address Appellants' claim that the Director Defendants breached their duty of good faith.  As for Appellants' allegation in the Amended Complaint that the Director Defendants breached their duty of fair dealing, Appellants do not mention the duty of fair dealing in their briefing to this Court, and therefore, we need not consider it.  See Falco, 795 F.3d at 868.

management's corresponding concealment because 1) they attended board meetings where risks of the merger were discussed, 2) their general roles as directors impute such knowledge to them, and 3) due diligence would have disclosed the issues if done properly. [Appellants] contend that the availability of information regarding Health Net's history and practices put the directors on notice of significant risks to Centene in pursuing the merger, thus demonstrating the directors' bad faith in allowing the merger to proceed.

R. Doc. 95, at 26-27. Appellants' allegations of mere knowledge fall short of the "high hurdle" plaintiffs must clear when pleading bad faith in the demand excusal context. McElrath, 224 A.3d at 993. Appellants repeatedly allege that the Director Defendants acquired knowledge of the problems with Health Net from attendance at board meetings, but even assuming that the Director Defendants had this knowledge, Appellants plead no particularized facts showing that the Director Defendants failed to disclose these facts to shareholders in bad faith—that is, with intent to do harm or in conscious disregard of their responsibilities.[11] Therefore, we agree with the

_____

[11]In their briefing, Appellants argue that this case is unlike In re TrueCar, Inc. Shareholder Derivative Litigation, where the Delaware Chancery Court held that the plaintiffs failed to sufficiently plead facts demonstrating scienter because they did not plead with particularity facts demonstrating that any directors knew of certain information. No. 2019-0672-AGB, 2020 WL 5816761, at *19 (Del. Ch. Sept. 30, 2020). Appellants contend that, here, the allegations in the Amended Complaint support a reasonable inference that the Director Defendants knew about certain information that was not disclosed in Centene's public filings. That, according to Appellants, should lead this Court to reach the opposite conclusion as the court did in TrueCar and find that Appellants have sufficiently pled scienter. Appellants' reliance on TrueCar is similar to their reliance on Cottrell, see supra note 4; they seem to take from TrueCar that if they can demonstrate the thing that the plaintiffs in TrueCar failed to, namely, knowledge of certain information, then they will have successfully shown that the Director Defendants face a substantial likelihood of liability for breach of the duty of loyalty. This is not so. As discussed above, Delaware Supreme Court precedent requires Appellants to demonstrate not just that the Director Defendants knew of problems with Health Net, but also that they failed to disclose this information to shareholders with "an actual intent to do harm" or in "intentional dereliction of [their] dut[ies]." McElrath, 224 A.3d at 991 (citation omitted).

district court that the Amended Complaint does not plead particularized facts that, if proven, would show that the Director Defendants acted with scienter sufficient to support a breach of duty of loyalty claim. Accordingly, we find that Appellants have failed to plead particularized facts demonstrating that at least half of the Board faces a substantial likelihood of liability for breach of the duty of loyalty. Tri-State, 262 A.3d at 1059.

Appellants have waived any argument pertaining to a Caremark[12] claim. A Caremark claim is one in which it is alleged "that the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in doing so they violated a duty to be active monitors of corporate performance." 698 A.2d at 967. This claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." Id. Appellants make no argument on appeal contesting the district court's conclusion that the Amended Complaint fails to allege particularized facts showing that a majority of the Board faces a substantial likelihood of liability for failing to exercise their oversight duties in bad faith, and thus, we need not consider the matter. See Falco, 795 F.3d at 868.

C.

Appellants style their third claim as a derivative claim for breach of the fiduciary duties of loyalty, good faith, and candor in connection with federal securities law violations.[13] Specifically, they allege that Appellees, including the

_____

[12]In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996).

[13]Appellees argue that Appellants failed to argue any fiduciary duty claim pertaining to the April 10-Q before the district court and have therefore waived any such claim on appeal. Appellees' Br. 35. Though Appellants did not explicitly mention the April 10-Q in the argument section of their opposition to Appellees' motion to dismiss, Appellants' reference therein to misleading statements made "in violation of the federal securities laws *both in connection with the merger and later*,"

-18-

Director Defendants, "violated and breached their duty of loyalty, good faith and candor by concealing the problems and risks concerning Health Net's business and by issuing false and misleading financial statements in violation of [Generally Accepted Accounting Principles] and false and misleading SEC filings" and that this breach caused Centene to violate federal securities laws.  R. Doc. 45-1, at 89.

"The duty of disclosure is, and always has been, a specific application of the general fiduciary duty owed by directors."[14]  Malone, 722 A.2d at 10.  "A director's

_____

gives us reason to doubt that they have waived their arguments pertaining to the April 10-Q.  R. Doc. 80, at 16 (emphasis added).  Nonetheless, it is immaterial whether or not Appellants have waived any fiduciary duty claim based on the April 10-Q because Appellants have failed to plead particularized facts demonstrating that at least half of the Board faces a substantial likelihood of liability for breach of fiduciary duty in connection with the April 10-Q.

[14]We interpret Appellants' "duty of loyalty, good faith, and candor" claim as a mislabeled duty of disclosure claim and proceed accordingly.  Use of the term "duty of candor" has long been abandoned by Delaware courts.  See In re Orchard Enters., Inc. S'Holder Litig., 88 A.3d 1, 29 n.9 (Del. Ch. 2014).  In Stroud v. Grace, the Delaware Supreme Court held:

> [T]he term "duty of candor" has no well accepted meaning in the disclosure context.  Its use is both confusing and imprecise given the well-established principles and duties of disclosure that otherwise exist.  Thus, it is more appropriate for our courts to speak of a duty of disclosure based on a materiality standard rather than the unhelpful terminology that has crept into Delaware court decisions as a "duty of candor."

606 A.2d 75, 84 (Del. 1992).  Further, "[t]he duty of disclosure is not an independent duty, but derives from the duties of care and loyalty," Pfeffer v. Redstone, 965 A.2d 676, 684 (Del. 2009) (alteration in original), and, as discussed supra note 10, the duty of good faith is a subsidiary element of the duty of loyalty, so Appellants' reference to the "duty of loyalty, good faith, and candor" is redundant.

-19-

specific disclosure obligations are defined by the context in which the director communicates." Dohmen, 234 A.3d at 1168.

> When directors request discretionary stockholder action, [such as approval of a merger,] they must disclose fully and fairly all material facts within their control bearing on the request. This application of the fiduciary duties of care and loyalty is referred to as the "fiduciary duty of disclosure." Directors breach their fiduciary duty of disclosure when the "alleged omission or misrepresentation is material."
>
> . . . .
>
> Another context is a communication not associated with a request for stockholder action, such as when directors make periodic financial disclosures required by securities laws. In this context, the fiduciary duty of disclosure does not apply. But under the board's duties of care and loyalty, the directors must still deal honestly with stockholders.

Id. at 1168-69 (citations omitted). Therefore, it is clear that the duty of disclosure only applies to communications requesting stockholder action and the more general duties of care and loyalty apply to communications not requesting stockholder action.

Here, the only communication made by the Director Defendants requesting stockholder action was the Proxy Statement. Thus, Appellants' argument that the Director Defendants breached their duty of disclosure by allowing Centene to publish false and misleading statements in the April 10-Q is misguided. The only duties that applied to the Director Defendants when filing the April 10-Q were the duties of care and loyalty, see id., and as discussed in Section II.B., Appellants have failed to plead particularized facts demonstrating that at least half of the Board faces a substantial likelihood of liability for breaching these duties.

-20-

As to the Proxy Statement, "[t]he essential inquiry" in a duty of disclosure action "is whether the alleged omission or misrepresentation is material." Malone, 722 A.2d at 12.

> "Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading."  "Material facts are those facts for which 'there is a substantial likelihood that a reasonable person would consider [them] important in deciding how to vote.'"

> . . . .

> "To state a claim for breach of the fiduciary duty of disclosure on the basis of a false statement or representation, a plaintiff must identify (1) a material statement or representation in a communication contemplating stockholder action (2) that is false." . . . "[C]onclusory allegations need not be treated as true, nor should inferences be drawn unless they truly are reasonable."

Pfeffer, 965 A.2d at 684-85 (first and second alterations in original) (citations omitted).  Our analysis here is similar to that under supra II.A.  From what we can discern,[15] Appellants argue that the Proxy Statement misleadingly states that "[t]he combination of Health Net and Centene would maintain and enhance Health Net's strong commercial business in California, which could also serve as a model for other states in which similar opportunities can be identified" and omitted information that would have revealed material facts about Health Net's business. Appellants' Br. 35 (alteration in original).  As noted above, Appellants do not allege

---

[15]Appellants' failure to structure the argument section of their opening brief in a claim-by-claim manner, see supra note 4, has made it difficult for us to extract their individual arguments pertaining to Claims 1-3.  In their reply brief, where Appellants do address their individual claims, Appellants focus their entire duty of candor discussion on the April 10-Q. We recognize, however, that Appellants seem to make a duty of disclosure argument regarding the Proxy Statement in their opening brief. See Appellants' Br. 35-36.

in the Amended Complaint that the statement concerning Health Net's California business was misleading, and therefore, it is not appropriate for our consideration. See Norwest Bank of N.D., N.A. v. Doth, 159 F.3d 328, 334 (8th Cir. 1998) ("As a general rule, we will not consider issues not presented to [the lower court] in the first instance." (alteration in original) (citation omitted)).

As for the omitted information regarding Health Net's business, see R. Doc. 45-1, at 32, "[o]mitted information is *material* if a reasonable stockholder would consider it important in deciding whether to tender his shares or would find that the information has altered the 'total mix' of information available," Pfeffer, 965 A.2d at 686 (citation omitted). Here, though we recognize that Appellants generally allege in the Amended Complaint that the Director Defendants' alleged concealment of these omissions caused Centene to overpay for Health Net, see R. Doc. 45-1, at 4-5, 8, they have not pled facts demonstrating that a reasonable stockholder would consider these omissions important in deciding to tender his shares or that the information would have altered the "total mix" of information available, nor have they made such an argument in their briefing. See Pfeffer, 965 A.2d at 686. Though our analysis of Claim 3 differs somewhat from that of the district court, we find that the Amended Complaint does not sufficiently plead particularized facts demonstrating that at least half of the Board faces a substantial likelihood of liability for breach of the duty of disclosure and affirm the district court's dismissal as it pertains to this claim. See Carlsen, 833 F.3d at 910 ("[W]e may affirm a judgment on any ground supported by the record . . . ." (first alteration in original) (citation omitted)).

D.

Appellants' fourth claim alleges that two of the eight Director Defendants, Neidorff and outside-director Richard Gephardt, along with three Centene officers sold and disposed of Centene stock while in possession of insider information. Under the second Tri-State question, which requires that at least half of the demand board face a substantial likelihood of liability on an alleged claim in order for

demand to be futile, Appellants' futility argument appears to be patently insufficient. See 262 A.3d at 1059. Appellants acknowledge that the Amended Complaint alleges this claim against just two of the Director Defendants but, nonetheless, argue that demand is not futile because pursuing this claim against Neidorff and Gephardt would require the remaining Director Defendants to make arguments that would expose them to risk of liability for breach of fiduciary duty and securities law violations. While it is true that Claim 4 alleges that Neidorff and Gephardt knew and concealed material facts concerning Health Net's business, Appellants do not meaningfully argue, and we do not see, how proving this allegation would require the remaining Director Defendants to make the same materiality and scienter arguments as implicated by Claims 1-3.

To state a claim for insider trading liability in this context, Appellants "must show that: '1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information.'" Kahn v. Kolberg Kravis Roberts & Co., 23 A.3d 831, 838 (Del. 2011) (citation omitted). This standard is different from the foregoing standards, which each require either proof of material misrepresentations or omissions or scienter, or both. Therefore, because the arguments that the remaining Director Defendants would have to pursue in order to bring this claim would not require them to prove that they themselves made material misrepresentations or omissions with or without scienter, we find Appellants' argument unavailing; "the factual predicate underlying" Claim 4 is not "so intertwined" with that of Claims 1-3 that pursuit of Claim 4 would expose the remaining Director Defendants to risk of liability under Claims 1-3. See In re CBS S'Holder Class Action & Derivative Litig., No. 2020-0111-JRS, 2021 WL 268779, at *50 (Del. Ch. Jan. 27, 2021), as corrected (Feb. 4, 2021). We agree with the reasoning of courts that have addressed a similar factual situation, and because the Amended Complaint alleges an insider trading claim against just two of the eight Director Defendants, we affirm the district court's finding that Appellants have failed to demonstrate that a majority of the Board faces a substantial likelihood of liability under Claim 4. See In re China Auto. Sys. Inc.

Derivative Litig., No. 7145-VCN, 2013 WL 4672059, at \*10 (Del. Ch. Aug. 30, 2013) (finding plaintiffs who pled only that two of five directors engaged in insider trading had not demonstrated demand futility); Markewich ex rel. Medtronic, Inc. v. Collins, 622 F. Supp. 2d 802, 814 (D. Minn. 2009) (concluding that demand was not futile where majority of board did not face substantial likelihood of liability for insider trading).

E.

In their fifth claim, Appellants allege that all Appellees, including the Director Defendants, were unjustly enriched at the expense and to the detriment of Centene "as a result of the compensation and remuneration they received while breaching fiduciary duties owed to Centene and through their sale or disposition of [Centene] stock at artificially inflated prices." R. Doc. 45-1, at 90. Under Delaware law, "[a]t the pleadings stage, an unjust enrichment claim that is entirely duplicative of a breach of fiduciary duty claim—*i.e.*, where both claims are premised on the same purported breach of fiduciary duty—is frequently treated 'in the same manner when resolving a motion to dismiss.'" Calma ex rel. Citrix Sys., Inc. v. Templeton, 114 A.3d 563, 591 (Del. Ch. 2015) (citation omitted). Therefore, because we find that Appellants have failed to demonstrate that at least half of the Board faces a substantial likelihood of liability on Appellants' breach of fiduciary duty claims, we find the same as to Appellants' unjust enrichment claim as it pertains to the alleged breaches of fiduciary duties. Cf. id. at 592 (finding it plausible that plaintiff could recover under unjust enrichment claim where plaintiff had stated a claim for breach of fiduciary duty). Likewise, because we find that at least half of the Board does not face a substantial likelihood of liability under Appellants' insider trading claim, we further find the same as to Appellants' unjust enrichment claim as it pertains to alleged insider trading and affirm the district court's findings as to Claim 5. See In re China Auto, 2013 WL 4672059, at \*10.

-24-

III.

Because Appellants have failed to plead particularized facts demonstrating that at least half of the Board faces a substantial likelihood of liability as to any claim brought in the Amended Complaint, we affirm.[16]

_____

_____

[16]In addition to Appellants' Motion to Supplement the Record and/or for Judicial Notice, discussed supra note 8, we have reviewed Appellees' Request for Judicial Notice, which asks us to take judicial notice of excerpts from Health Net's Form 10-K annual report filed with the SEC on February 27, 2015 and the April 10-Q and a slide from a PowerPoint presentation prepared for the April 25, 2016 Audit Committee meeting. Though we note that "an appellate court may take judicial notice of a fact for the first time on appeal," Gustafson v. Cornelius Co., 724 F.2d 75, 79 (8th Cir. 1983), and that we may consider matters incorporated by reference in the Amended Complaint and matters of public record, see Zean v. Fairview Health Servs., 858 F.3d 520, 526 (8th Cir. 2017), because consideration of the information provided in the Exhibits attached to Appellees' Motion for Judicial Notice would not change the outcome of the present case, we deny the motion as moot, see Robinson, 698 F. App'x at 859; Mosley v. Fatoki, 762 F. App'x 358, 359 (8th Cir. 2019) (per curiam).